STATE OF NORTH CAROLINA v. ANDREW ARTHUR BEST

No. 32

(Filed 14 April 1977)

1. Narcotics § 1; Physicians and Surgeons § 1— prescription of controlled substance by physician — no sale or delivery

   The action of a physician in prescribing a controlled substance does not amount to a "sale or delivery" as proscribed by G.S. 90-95(a)(1).

2. Narcotics § 1; Physicians and Surgeons § 1.— Controlled Substances Act — parallel systems of drug regulation

   By enacting the N. C. Controlled Substances Act the Legislature established parallel systems of drug regulation—one system, administered through G.S. 90-95, to control those who "sell and deliver" in the streets; the other, administered through G.S. 90-108, to regulate those permitted by law to conduct authorized transactions with controlled substances.

3. Narcotics § 1; Physicians and Surgeons § 1— prescription of controlled substance by physician — normal course of practice — violation of statute

   Where a licensed physician merely writes a prescription for a controlled substance listed in Schedules II, III, IV or V of the Controlled Substances Act, and nothing more, such act is not a violation of G.S. 90-95(a)(1); however, if that prescription is written outside

State v. Best

the normal course of professional practice in N. C. and not for a legitimate medical purpose, the physician violates G.S. 90-108.

4. Narcotics § 4; Physicians and Surgeons § 1— prescription written by physician — charge of sale and delivery — variance between indictment and proof

A fatal variance existed between the allegations and the proof and it was error to deny defendant's motion to dismiss where defendant was indicted and tried on the theory that he did "sell and deliver" a controlled substance in violation of G.S. 90-95(a)(1), but the evidence disclosed a violation, if at all, of G.S. 90-108 in that defendant, a licensed physician who wrote prescriptions for controlled substances, may in doing so have acted outside the normal course of professional practice in N. C. and not for a legitimate medical purpose.

DEFENDANT appeals from decision of the Court of Appeals upholding judgment of *Tillery, J.,* 10 November 1975 Criminal Session, PITT Superior Court.

Defendant was tried upon six separate bills of indictment. Four of the bills charged that on 4 February, 27 February and 19 March 1975 defendant did unlawfully, willfully and feloniously sell and deliver Ritalin, a Schedule II Controlled Substance, and on 25 March 1975, Phenobarbital, a Schedule IV Controlled Substance, to M. T. Owens, Special Agent of the State Bureau of Investigation, and that said sales and deliveries were not within the normal course of his professional practice. One bill charges such sale and delivery of Preludin Endurets, a Schedule II Controlled Substance, on 18 March 1975, to Curtis Douglas, Special Agent of the State Bureau of Investigation. Finally, one bill charges such sale and delivery of Preludin Endurets on 6 March 1975 to Ray Eastman, Special Agent of the State Bureau of Investigation.

SBI Agent Martha T. Owens testified that on 4 February 1975 she drove to the office of Dr. Andrew Arthur Best, accompanied by SBI Agent Michael Boulus and others, and then entered the office alone. She told the receptionist she was Martha Ann Taylor residing at Apartment 22, Cherry Court, Greenville, North Carolina; date of birth, 2 March 1945; occupation, waitress. Agent Owens furnished the name of her father and mother, after which the receptionist weighed her and took her blood pressure and temperature in an examination room. Shortly thereafter Dr. Best entered and Agent Owens told him she was working as a waitress at the bus station and needed something to stay awake. He asked her what she had been tak-

ing and she told him "Dexadrine and other junk." He looked at her card which had been filled out by the receptionist (State's Exhibit 8) and said that Dexadrine was probably the reason her blood pressure was up. He left the examining room, returned and stated that no buses came in late at night and inquired what hours she worked. Agent Owens told him she worked at Hardee's from 9 to 5 and that from 8 until 2 or 3 in the morning she was hustling. Dr. Best said, "Oh, you are doing that kind of work." He then told her to be careful with Dexadrine, "that the heat is on it." He told her to return to the reception room, which she did. Shortly thereafter, Dr. Best brought out a prescription which read: "Martha Taylor, Apartment 22, Cherry Court, dated 2-4-75, Ritalin tablets, No. 36, one tablet b.i.d." The receptionist gave the prescription to Agent Owens who paid the receptionist $5 and got a receipt. She then left the office and rejoined SBI Agent Boulus and others. After the prescription was copied at the Greenville SBI office, Agent Owens took it to Hollowell's Drug Store where it was filled.

Agent Owens again saw Dr. Best in his office on 27 February 1975. She carried with her the bottle in which she received the Ritalin tablets at Hollowell's Drug Store and told the receptionist she wanted a refill. The receptionist took the bottle, consulted a yellow card from the filing cabinet (State's Exhibit 8) and, while Agent Owens stood by, wrote out the prescription in her presence. After the receptionist wrote the prescription, Dr. Best entered the reception room, which was full of waiting patients, placed the prescription bearing his signature on the counter and said, "Here it is." Agent Owens paid the receptionist $5, got a receipt, left and rejoined SBI Agent Boulus and others. After the prescription was copied at the Greenville SBI office, Agent Owens carried it to Hollowell's Drug Store where it was filled, again receiving thirty-six Ritalin tablets.

On 19 March 1975 Agent Owens returned to Dr. Best's office carrying with her the bottle she last received from Hollowell's Drug Store, and told the receptionist she wanted it refilled. The receptionist looked at the bottle and again pulled the yellow card (State's Exhibit 8) from the files. She left and went into the examination room and had a prescription with her when she returned. Dr. Best's signature was written on it, and the receptionist then filled in the prescription for thirty-six Ritalin tablets. After the receptionist gave her the prescription,

State v. Best

Agent Owens asked to see the doctor but did not get to see him. She paid the receptionist $5 in cash and got a receipt. She then rejoined SBI Agent Boulus and others who were maintaining surveillance outside the building. After the prescription was copied at the SBI office in Greenville, Agent Owens carried it to Hollowell's Drug Store where it was filled.

On 25 March 1975 Agent Owens returned to Dr. Best's office for the fourth time, informed the receptionist that she wanted to see the doctor and signed the register. Shortly after taking a seat she was called to the examining room by a nurse who took her blood pressure and temperature. As she was leaving the room, Dr. Best entered and asked what he could do for her. She told Dr. Best the pills he had given her were making her nervous. Dr. Best said she should have skipped a day in taking them so as to take one every other day. He said he could give her something to calm her down. He left the examining room and sometime later a nurse told her to go back to the reception room, which she did. After returning to the reception area, Dr. Best placed a small vial of white tablets on the counter and said, "Here you are Mrs. Taylor." She paid the receptionist $8 for the vial of pills and got a receipt. The directions read "one tablet before supper and two at bedtime." Agent Owens left the office and rejoined other SBI agents who were waiting outside. They counted the tablets in the vial and determined that there were 115 Phenobarbital tablets.

State's Exhibit 8 is the card that the receptionist filled out on 4 February 1975 on the first visit of Agent Owens. After the four visits by Agent Owens, that card contained the following entries:

> "Mrs. Martha Ann Taylor, Apartment 22 Cherry Court, Greenville, North Carolina; 2-4-75; d.o.b. 3-2-45; occupation, waitress; age 29, sex F, and she circled S [sic]; family history, father, Mr. Willie Taylor, mother Mrs. Iradell Hinton Taylor. On the other side is written 2-4-75, weight 147, BP 160/80 temp. 99.6, works nights needs something to stay awake; Rx Ritalin 10 milligrams, 36, and charge cost $5.00; 2-27-75, Ritalin number 36, charge $5.00, paid $5.00; 3-19-75, Ritalin tabs Number 36, charge $5.00, paid $5.00; BP 150-90, temp. 98.6, nervousness, Rx P.B. tabs I can't read that, charge $8.00, paid $8.00."

Dr. Edward G. Bond was qualified as an expert and testified that the controlled substance Ritalin has three legitimate uses, to wit: (1) for the so-called hyperactive child, (2) in cases of narcolepsy (a sleeping disorder), and (3) for people with a mild depression. Dr. Bond was then asked a hypothetical question that assumed facts substantially in accord with the testimony of SBI Agent Martha T. Owens with respect to her drug transaction with defendant in his office on 4 February 1975. Based upon those assumed facts and on his experience as a medical practitioner, Dr. Bond testified that in his opinion such a prescription was outside the usual course of a doctor's professional practice in this State and was not written for a legitimate medical purpose.

Dr. Bond was then asked a second hypothetical question that assumed facts substantially in accord with SBI Agent Martha T. Owens' testimony with respect to her drug transaction with defendant in his office on 27 February 1975. Based upon those assumed facts and on his experience as a medical practitioner, Dr. Bond stated that in his opinion such a prescription was outside the usual course of a doctor's professional practice in this State and was not written for a legitimate medical purpose.

Dr. Bond was then asked a third hypothetical question that assumed facts substantially in accord with the testimony of SBI Agent Martha T. Owens with respect to her drug transaction with defendant in his office on 19 March 1975. Based on those assumed facts and on his experience as a medical practitioner, Dr. Bond testified that in his opinion such a prescription was outside the usual course of a doctor's professional practice in this State and was not written for a legitimate medical purpose.

Dr. Bond was then asked a fourth hypothetical question that assumed facts substantially in accord with the testimony of SBI Agent Martha T. Owens with respect to the drug transaction involving Phenobarbital with defendant in his office on 25 March 1975. Based upon those assumed facts and upon his experience as a medical practitioner, Dr. Bond testified that in his opinion such delivery of Phenobarbital was outside the usual course of a doctor's professional practice in this State and was not for a legitimate medical purpose.

The State also offered evidence with respect to the alleged unlawful sale and delivery of the controlled substance Preludin Endurets to SBI Agents Curtis Douglas and Ray Eastman.

The defendant, Dr. Best, testified in his own behalf. He said he was a family practitioner and sees between eighty and ninety people on an average day. He was found by the court to be an expert in the field of general practice.

Dr. Best testified that SBI Agent Owens visited his office several times, using the alias of Martha Ann Taylor. On her initial visit on 4 February 1975 her weight, blood pressure and temperature were taken and recorded by his nurse. Also recorded on the card (State's Exhibit 8) was the fact that she was working at night and needed something to stay awake. When defendant talked with her in the examining room he got the impression she was working as a waitress on two jobs and had just moved to town. She told him she had a tendency to fall asleep on her customers and she was afraid she would be fired if she didn't get something to control the situation. Dr. Best said he reviewed the clinical information on her weight, blood pressure and temperature and formed the diagnostic impression that the patient was suffering from intermittent narcolepsy. He relied solely on her history in forming his diagnosis and planned to prescribe small controlled doses of Ritalin, monitoring results by getting information from the patient on return visits. He prescribed Ritalin in 10 milligram strength with instructions to take one tablet twice per day for eighteen days.

Agent Owens returned on 27 February 1975, twenty-three days after the original prescription. Without seeing her, Dr. Best said he wrote a refill prescription because his receptionist did not report any complaint of side effects or any other difficulty with the drug. On 19 March 1975 she returned to his office and asked for a third prescription for a refill. On this occasion Dr. Best testified that he told Agent Owens, as he handed her the prescription for a refill, that she could not stay on this medication forever. On 25 March 1975 he saw and talked with Agent Owens after his nurse had taken her blood pressure and temperature. She complained of nervousness which she thought was a reaction to the Ritalin. In response to his question she said she had stopped taking the drug. Dr. Best testified he formed the diagnostic impression that Agent Owens could be having side effects from the Ritalin so he decided to

discontinue the use of Ritalin and gave her the Phenobarbital to control the symptoms she was experiencing from Ritalin. He testified that he prescribed Phenobarbital and dispensed it directly in half grain tablet form because he felt that would save her some money on the cost of the drug. She paid $8 for the consultation and the Phenobarbital.

Speaking as a medical expert and in response to hypothetical questions posed by defense counsel, defendant testified that he prescribed Ritalin and dispensed Phenobarbital to Agent Owens for a legitimate medical purpose and that he believed his conduct was within the normal course of professional practice of family medicine in this State. He said he did so in good faith based on representations made to him by the patient.

On cross-examination Dr. Best answered, with some equivocation, the first and last hypothetical questions, as posed by the State, in the same manner as Dr. Bond answered them but disagreed with the State's witness on the second and third hypothetical questions, stating that he felt that that refill prescription had been written and delivered to Agent Owens for a legitimate medical purpose and that such conduct was within the normal course of professional practice in this State.

Dr. Malene Grant Irons, when asked four hypothetical questions formulated by defense counsel concerning the transactions between Dr. Best and Agent Owens, stated that the transactions were within the normal course of professional practice in this State. Later when asked hypothetical questions by the State, which were substantially the same as those asked of Dr. Bond, Dr. Irons answered the first three hypothetical questions in the same manner as Dr. Bond answered them but stated that the transaction embraced in the fourth question, with respect to the Phenobarbital, was within the normal course of professional practice in this State except that she would have dispensed fewer Phenobarbital tablets under the circumstances.

Defendant called six other doctors to give expert testimony: Drs. Jack Wilkerson, Ray Minges, Ernest Ferguson, Jack Koontz, Donald Garrenton and Edwin Monroe. All of these witnesses, with the exception of Dr. Ferguson, responded to the hypothetical questions of both the defendant and the State with the answer that the described activities were in the normal course of professional practice in this State and were for a legitimate medical purpose. Dr. Ferguson gave this response to

State v. Best

the hypothetical question as posed by the defense but had no opinion as to the question formulated by the State.

Defendant also offered evidence tending to show that he is a person of good character, enjoys a good reputation in the community, and is a hard working doctor and civic leader.

The jury found defendant not guilty of four of the six cases, to wit: (1) sale and delivery of Ritalin to SBI Agent Owens on 4 February 1975, (2) sale and delivery of Phenobarbital to SBI Agent Owens on 25 March 1975, (3) sale and delivery of Preludin Endurets to SBI Agent Eastman on 6 March 1975, and (4) sale and delivery of Preludin Endurets to SBI Agent Douglas on 18 March 1975. Defendant was convicted by the jury in Case No. 75-CR-4598, sale and delivery of Ritalin to SBI Agent Owens on 27 February 1975 and in Case No. 75-CR-4595, sale and delivery of Ritalin to SBI Agent Owens on 19 March 1975. For each conviction the court imposed a prison sentence of twelve months, suspended upon payment of a $1,000 fine and costs. Upon appeal, these judgments were upheld by the Court of Appeals with Clark, J., dissenting. Defendant appealed to the Supreme Court as of right pursuant to the provisions of G.S. 7A-30(2).

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Associate Attorney, for the State of North Carolina.*

*James, Hite, Cavendish & Blount, by Marvin Blount, Jr., of counsel for defendant appellant.*

HUSKINS, Justice.

The defendant, Dr. Best, was arrested on 26 March 1975, pursuant to a warrant charging him with violation of G.S. 90-95(a)(1). That statute reads in pertinent part as follows:

"(a) Except as authorized by this Article, it is unlawful for any person:

(1) To manufacture, *sell or deliver* . . . a controlled substance;" (Emphasis added.)

Defendant was indicted and convicted under charges that on two occasions he "unlawfully and wilfully did feloniously *sell and deliver* a controlled substance, to wit: Methylphenidate in the form of Ritalin, which is included in Schedule II of the

North Carolina Controlled Substances Act, not within the normal course of his professional practice, to M. T. Owens, Special Agent, SBI, Diversion Investigative Unit." (Emphasis added.)

Evidence elicited at trial tends to show that on 27 February 1975 and 19 March 1975 Dr. Best gave prescriptions to SBI Agent M. T. Owens for Ritalin, a Schedule II Controlled Substance. The State produced one expert witness who stated that under similar circumstances, related in a hypothetical question, the conduct of the doctor in prescribing the drug was outside the normal course of professional practice in North Carolina and not for a legitimate medical purpose.

At the close of the State's evidence defendant's motion to dismiss was denied. This motion was renewed at the close of all the evidence and is properly before this Court. *State v. Rigsbee,* 285 N.C. 708, 208 S.E. 2d 656 (1974).

[1]   We have said that a defendant must be convicted, if at all, of the particular offense charged in the bill of indictment. "Whether there is a fatal variance between the indictment and the proof is properly presented by defendant's motion to dismiss." *State v. Cooper,* 275 N.C. 283, 167 S.E. 2d 266 (1969) ; *State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741 (1967). Thus the threshold question presented by this case is whether the offense charged conforms to the evidence elicited; that is, does the action of a physician in *prescribing* a controlled substance amount to a "sale · or delivery" as proscribed by G.S. 90-95 (a) (1) ? For the reasons which follow, we hold that it does not.

The North Carolina Controlled Substances Act (Article 5 of Chapter 90 of the General Statutes) is not a model of clarity or good draftsmanship and, with respect to particular applications, its interpretation is clouded by gaps and inconsistencies. Analysis of the entire Act compels the conclusion that the Legislature has established parallel systems of regulation for controlled substances. The separate systems are distinguished according to the nature of the transaction and the status of the individuals involved. Simply put, one system applies to "street traffickers," while the second regulates the dispensation of controlled drugs for legitimate medical purposes. Within each system there are further gradations, based generally on the seriousness of the drug involved and the nature of the

transaction. For example, *compare* G.S. 90-95(b)(1) *with* G.S. 90-95(b)(2) *and* G.S. 90-95(b) *with* G.S. 90-95(c).

Prior to 1971, drug transactions were regulated in North Carolina through the Uniform Narcotic Drug Act, Article 5 of Chapter 90 of the General Statutes (1965), and Barbiturate and Stimulant Drugs, Article 5A of Chapter 90 of the General Statutes (1965). Under that scheme, the statute under which a defendant was prosecuted was determined by the nature of the drug involved. Thus under Article 5 it was unlawful for a person to "manufacture, possess, have under his control, sell, prescribe, administer, dispense, or compound any narcotic drug, except as authorized . . . . " G.S. 90-88 (1965). "Narcotic drugs" included coca leaves, opium, cannabis, and others chemically similar. G.S. 90-87(9) (Cum. Supp. 1969). Prescribing, administering and dispensing were specifically authorized when done in good faith and in the course of professional practice. G.S. 90-94 (1965). The penalty for a first violation of that article was a fine of not more than $1,000 or imprisonment for not more than five years. G.S. 90-111 (Cum. Supp. 1969). Penalties for subsequent violations were higher.

In 1971 the Legislature made basic changes in North Carolina drug laws, bringing them into closer alignment with Federal law, 21 U.S.C. §§ 801, et seq., and with the Uniform Controlled Substances Act found in Volume 9 of The Uniform Laws, Annotated.

In skeletal form the present system of control over *physicians* operates as follows: (1) All transactions with controlled substances are prohibited by G.S. 90-95 *except as authorized.* (2) Under G.S. 90-101 a physician who meets established objective criteria is *authorized* to make certain transactions with controlled substances and thus is *exempted* from the proscriptions of G.S. 90-95. (3) Control is reasserted under G.S. 90-108 whereby the physician's actions with respect to these transactions must be within the normal course of professional practice in this State and for a legitimate medical purpose. We now look at the scheme in more detail.

We initially note that in the 1971 enactment schedules were set up classifying various drugs based upon potential for abuse and accepted medical use. See G.S. 90-88 to 94. Then by enact-

ment of G.S. 90-95 (Cum. Supp. 1971), the General Assembly provided as follows:

"(a) Except as authorized by this Article, it shall be unlawful for any person:

(1) To manufacture, distribute or dispense or possess with intent to distribute a controlled substance listed in any schedule of this Article;

(2) To create, distribute or possess with intent to distribute a counterfeit controlled substance included in any schedule of this Article;

(3) To possess a controlled substance included in any schedule of this Article."

G.S. 90-95 was amended in 1973 to read:

"(a) Except as authorized by this Article, it is unlawful for any person:

(1) To manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance;

(2) To create, sell or deliver, or possess with intent to sell or deliver, a counterfeit controlled substance;

(3) To possess a controlled substance."

This statute prohibits any person from manufacturing, selling, delivering or possessing with intent to manufacture, sell or deliver, a controlled substance, *except as authorized by Article 5*. We now examine Article 5 to determine what transactions it authorizes.

G.S. 90-101 in pertinent part provides:

"(b) Persons registered by the North Carolina Drug Authority under this Article (including research facilities) to manufacture, distribute, dispense or conduct research with controlled substances may possess, manufacture, distribute, dispense or conduct research with those substances to the extent authorized by their registration and in conformity with the other provisions of this Article.

(c) The following persons shall not be required to register and may lawfully possess controlled substances under the provisions of this Article:

\*    \*    \*    \*

(4) Practitioners licensed in North Carolina by their respective licensing boards under Articles 1, 2, 4, 6, 11 and 12 of this Chapter."

By these provisions a registrant is specifically authorized to manufacture, distribute, dispense, or conduct research with certain controlled substances. A practitioner is authorized to dispense and distribute.

We note that under the language of G.S. 90-101 (c) (4) a practitioner is only permitted to "possess" controlled substances. Normally the plain words of a statute control; however, where a literal interpretation will lead to an absurd result and contravene the manifest purpose of the statute, the reason and purpose of the law will be given effect and the strict letter disregarded. 7 N. C. Index 2d, Statutes § 5 and cases cited. In this instance it seems apparent that the Legislature intended to permit these practitioners listed in G.S. 90-101 (c) (4) not only to possess but also to distribute and dispense controlled substances as authorized by Article 5. *Compare* G.S. 90-101 *with* G.S. 90-102 (c), G.S. 90-105 and G.S. 90-106.

Thus the registrant or practitioner is, by his *status,* exempted from the proscriptions of G.S. 90-95. By the language of G.S. 90-101 this exemption is subject only to the requirement that the person claiming the exemption meet the following *objective criteria:* The person claiming the exemption must be a registrant, G.S. 90-87 (25), or not required to register, G.S. 90-101 (c) (4) ; and exemption from the provisions of G.S. 90-95 applies only when (a) persons claiming the exemption are engaged in transactions authorized by their registration and (b) those transactions involve drugs authorized by their registration. G.S. 90-101 (b) and (c) (4). A detailed breakdown of particular registration limitations is provided in I North Carolina Administrative Code, ch. 14, §§ .0105 and .0106.

We reemphasize that the standards are objective and, when met, exempt those who qualify from the proscriptions and penalties of G.S. 90-95. We do not construe G.S. 90-101 (c) (4) as incorporating a subjective standard through use of

the word "practitioners." Subsection (c) (4) is not found in the Uniform Controlled Substances Act or the Federal Controlled Substances Act. It was added in North Carolina law for the purpose of exempting from registration those persons licensed under the articles enumerated in said subsection, to wit: those licensed to practice medicine, dentistry, pharmacy, optometry, veterinary medicine, and podiatry. While technically a non-registrant would be exempted only when he was a "practitioner," and thus exempted only "so long as such activity is within the normal course of professional practice or research in this State," G.S. 90-87 (22), the addition of this subjective standard was not intended by the Legislature and we decline to impose it absent such intention. Otherwise the anomalous situation is created whereby those not required to register under G.S. 90-101 (c) (4) would be subjected to standards far more stringent and of a fundamentally different nature than the standards imposed on conventional registrants. Such a distinction would be wholly illogical and the law presumes that the Legislature did not intend such a result. *Town of Hudson v. City of Lenoir*, 279 N.C. 156, 181 S.E. 2d 443 (1971) ; *King v. Baldwin*, 276 N.C. 316, 172 S.E. 2d 12 (1970).

Exemption under G.S. 90-101 does not, however, give free rein to the person who has attained the exempt status. As that statute specifically notes, he must act in conformity with the other provisions of Article 5. G.S. 90-108 (a) (2) makes it unlawful for any person subject to the registration requirements of G.S. 90-101 "or a practitioner" to "distribute or dispense a controlled substance in violation of G.S. 90-105 or 90-106."

G.S. 90-105 provides:

"Controlled substances included in Schedules I and II of this Article shall be distributed only by a registrant or practitioner pursuant to an order form. Compliance with the provisions of the Federal Controlled Substances Act or its successor respecting order forms shall be deemed compliance with this section."

G.S. 90-106 (a) provides:

*"Prescriptions and labeling.* (a) Except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance included in Schedule II of this Article may be dispensed *without the written prescription of a practitioner."* (Emphasis added.)

"Dispensing" drugs includes the prescribing of them, G.S. 90-87(8) ; thus, under G.S. 90-106(a) a physician may lawfully prescribe drugs only through a written *prescription.* Inherent in the definition of a valid "prescription" is the requirement that it be written by a person licensed to dispense and acting within the normal course of professional practice within the State of North Carolina. *Compare* G.S. 90-87 (23) *with* G.S. 90-87(22). Thus where a physician prescribes Schedule II controlled drugs, not in the normal course of professional practice in this State, he is acting unlawfully and in violation of G.S. 90-106(a). This construction is bolstered by examination of G.S. 90-106 as a whole. Subsection (a), as noted, requires that Schedule II drugs may be dispensed only through a written prescription. Subsection (c) provides that Schedule III and IV drugs, with one exception, may be dispensed by a written prescription or an oral prescription promptly reduced to writing. Subsection (d), dealing with Schedule V drugs, *has no* prescription requirement, yet it specifically states that such drugs may be distributed or dispensed only for a medical purpose. It is inconceivable that the Legislature would have imposed tighter strictures on the dispensing of the less dangerous Schedule V drugs than it imposed on the dispensing of the drugs listed in Schedules II, III and IV. It is reasonable to assume that the Legislature intended all controlled substances to be dispensed only for legitimate medical purposes and it felt no need specifically to enunciate such a standard for Schedules II, III and IV drugs as it had already incorporated the legitimate medical purpose standard into the prescription requirement of subsections (a) and (c).

In addition, we note the provisions of the Code of Federal Regulations, 21 CFR § 1306.04(a) (1975), which are incorporated into our drug law through I North Carolina Administrative Code, ch. 14 § .0301. That section reads in relevant part:

"1306.04. Purpose of issue of prescription.

(a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. *The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner,* but a corresponding responsibility rests with the pharmacist who fills the prescription. *An order purporting to be a prescription issued not in the*

*usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829)* and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." (Emphasis added.)

Under this regulation the "legitimate medical purpose" requirement, implicit in the language of G.S. 90-106, is made explicit. *See United States v. Moore,* 423 U.S. 122, 46 L.Ed. 2d 333, 96 S.Ct. 335 (1975).

We are not unmindful that the parallel system scheme of drug regulation, as discussed in this opinion, has been rejected by other jurisdictions which have construed somewhat similar acts. *See e.g., United States v. Moore, supra; United States v. Rosenberg,* 515 F. 2d 190 (9th Cir. 1975) ; *United States v. Green,* 511 F. 2d 1062 (7th Cir. 1975) ; *United States v. Badia,* 490 F. 2d 296 (1st Cir. 1973) ; *United States v. Leigh,* 487 F. 2d 206 (5th Cir. 1973) ; *United States v. Bartee,* 479 F. 2d 484 (10th Cir. 1973) ; *State v. Vinson,* 298 So. 2d 505 (Fla. Dist. Ct. App. 1974) ; *see United States v. Ellzey,* 527 F. 2d 1306 (6th Cir. 1976). However, several aspects of the North Carolina Controlled Substances Act differ from both the Uniform Controlled Substances Act and the Federal Controlled Substances Act and lend credence to the view which we have taken.

It is apparent that the North Carolina Drug Commission, established by G.S. 143B-377 and empowered by G.S. 90-100 to set rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances, views Article 5 of Chapter 90 as establishing a parallel system. *See* N. C. Drug Authority, Practitioner's Drug Law Information (1974) ; N. C. Drug Authority, Physicians' Reference on Drug Laws and Emergency Treatment (1972). Where an issue of statutory construction arises, the construction adopted by those charged with the execution and administration of the law is relevant and may be considered. *MacPherson v. City of Asheville,* 283 N.C. 299, 196 S.E. 2d 200 (1973), and cases cited.

Further, we note that under Article 5 as enacted in 1971, the basic penalty provisions for a violation of G.S. 90-95 (a) (1) and an intentional violation of G.S. 90-108 were essentially

the same. Thus our statutory scheme is not burdened by a major problem found in the Federal Controlled Substances Act. The Federal counterpart to G.S. 90-108 provides only minor penalties. Had the Federal Act been construed as implementing parallel systems of control, medical "pushers" would be subject only to those minor penalties. It was presumed by the courts that since Congress recognized the particularly heinous nature of the prohibited conduct, it could not have intended such a result. *See United States v. Moore, supra.* No such problem exists under the North Carolina Act. On the contrary, the enactment of potentially stiff penalties under G.S. 90-108 indicates that the Legislature felt that the unlawful acts proscribed thereby were more than minor "technical violations" and fixed the punishment accordingly.

Other evidence of legislative intent is found in the 1973 Amendment to G.S. 90-95(a)(1) which changed the words "manufacture, distribute or dispense" to "manufacture, sell or deliver." When a statute is construed with reference to an amendment, it is "presumed that the legislature intended either (a) to change the substance of the original act, or (b) to clarify the meaning of it." *Childers v. Parker's, Inc.*, 274 N.C. 256, 162 S.E. 2d 481 (1968). We think the Legislature intended no substantive change in the Act by the 1973 amendment. That amendment, entitled an "Act to Increase the Penalties for Certain Violations of the Controlled Substances Act," 1973 Session Laws, c. 654, § 1, is clearly aimed at revision of the penalty structure for violation of the Act. That no real change was intended by the new wording is also indicated by G.S. 90-96.1, enacted at the same time, which refers to minors "accused with possessing or distributing a controlled substance in violation of G.S. 90-95(a)(1). . . ." 1973 Sess. Laws, c. 654, § 3. Had the Legislature intended substantive change by the substitution of the new terms "sell or deliver" in G.S. 90-95(a)(1), it would not have used the old term "distribute" when referring to that subsection.

[2] As no substantive change was intended, it follows that the new words were designed to clarify the meaning of the statute. By the use of "sell or deliver"—words of the street—rather than "distribute or dispense"—which have technical medical connotations and which are used extensively in those sections relating to regulation of registrants and practitioners—the Legislature intended to clarify and emphasize the dual nature of the regula-

tory scheme. We therefore conclude that by enacting the North Carolina Controlled Substances Act the Legislature established parallel systems of drug regulation—one system, administered through G.S. 90-95, to control those who "sell and deliver" in the streets; the other, administered through G.S. 90-108, to regulate those permitted by law to conduct authorized transactions with controlled substances.

It now becomes our duty to apply these statutes to the case at hand.

[4] Defendant was indicted and tried on the theory that he did "sell and deliver" a controlled substance in violation of G.S. 90-95(a)(1). The evidence, reviewed in the light most favorable to the State, discloses that the defendant was a licensed physician; that he wrote prescriptions for controlled substances; and that he, in doing so, may have acted outside the normal course of professional practice in North Carolina and not for a legitimate medical purpose.

[3] Where a licensed physician merely writes a prescription for a controlled substance listed in Schedules II, III, IV or V, and nothing more, such act is not a violation of G.S. 90-95 (a)(1). However, if that prescription is written outside the normal course of professional practice in North Carolina and not for a legitimate medical purpose, the physician violates G.S. 90-108.

[4] Applying this law to the facts as presented it is apparent that while the indictments follow the language of G.S. 90-95 (a)(1), the evidence discloses a violation, if at all, of G.S. 90-108.

This is analogous to the problem presented in *State v. Kimball*, 261 N.C. 582, 135 S.E. 2d 568 (1964). In that case the defendant was tried under an indictment which charged that while lawfully confined at a prison camp he feloniously escaped therefrom. The evidence revealed that the defendant failed to return to the prison while on work release. G.S. 148-45(a) made it a crime to escape from prison, while G.S. 148-45(b) specifically made it a crime to fail to return while on work release. Our Court, speaking through Justice Sharp (now Chief Justice), found that the "indictment in this case follows the language of subsection (a), but the evidence discloses a violation of subsection (b)." The Court then stated that defendant

would have been entitled to a nonsuit, had he moved for one, "for this *fatal variance.*" (Emphasis added.) *Accord, State v. Cooper,* 275 N.C. 283, 167 S.E. 2d 266 (1969).

We adhere to this reasoning and hold that a fatal variance exists between the allegations and the proof and it was error to deny defendant's motion to dismiss. *State v. Harvey,* 281 N.C. 1, 187 S.E. 2d 706 (1972); *State v. Cooper, supra; State v. Bell,* 270 N.C. 25, 153 S.E. 2d 741 (1967); *State v. Kimball, supra; State v. Overman,* 257 N.C. 464, 125 S.E. 2d 920 (1962); *State v. Jackson,* 218 N.C. 373, 11 S.E. 2d 149 (1940).

For the reasons stated the decision of the Court of Appeals is reversed. The cause is remanded to that court for entry of an order remanding the action to the Superior Court of Pitt County for entry of judgment dismissing the action.

Reversed and remanded.